**STATE**

v.

**Rafael GIL.**

**No. 87–244–C.A.**

Supreme Court of Rhode Island.

June 15, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, and Jane McSoley, Asst. Attys. Gen., for plaintiff.

Barbara Hurst, and Catherine A. Gibran, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This case is before the Supreme Court on the defendant's appeal from a judgment of conviction of manslaughter. We affirm his conviction.

On March 20, 1985, Rafael Gil (defendant) shot and killed Nelson Nunez (Nunez) outside the parking lot of the Burger King Restaurant on Broad Street in Providence, Rhode Island. At trial defendant testified that he shot Nunez in self-defense. He described a series of incidents between him and Nunez that he asserts led him to fear for his life and resulted in the shooting.

According to defendant's testimony, while he was a student at Central High School he learned that Nunez was the leader of a gang that stole radios. One day upon returning home for lunch he observed not only that Nunez and another man were leaving his apartment but also that his front door had been broken. Four or five months later he again returned home and found Nunez standing on his front porch. The front door was open and items had been stolen from his apartment. He reported both break-ins to the police but testified he did not identify Nunez for fear of reprisal.

The defendant further testified that on three occasions, one to which he was an eyewitness, Nunez broke into his car and stole his radio. He also stated that about one week prior to the shooting, Nunez threatened to steal defendant's car and a fight ensued that ended when a police car drove by. A second skirmish occurred between the two on Broad Street, that defendant contends was precipitated by Nunez and was broken up by some passersby. The defendant again stated that he did not report this incident to the police because he was afraid of Nunez.

A third incident between defendant and Nunez occurred the night before the shooting, near Roger Williams Park. It also terminated upon the arrival of police cars. The defendant testified that later that evening he was in a restaurant where he was warned by an acquaintance that Nunez had a gun and was going to kill him.

On the next day defendant and his friend Emerson Pimental (Pimental) went to the Burger King. He stated that while waiting outside his car on the street next to the parking lot, he noticed Nunez standing by his own car, staring at him. He testified that in light of what he had learned the night before, he was in a state of shock.

According to defendant's testimony, as he started to walk toward his car, Nunez's car quickly pulled up to him and Nunez stepped out of his car. The defendant then grabbed his gun from his car. He claimed that Nunez "made a quick move like he was taking something out." He testified that he then fired two shots into the ground, but Nunez kept coming toward him. He stated that although he warned Nunez not to do anything, Nunez made

another move and he shot him. He also testified that he did not remember firing the gun any further. He stated that after the shooting he drove to a K–Mart and, fearing reprisal from Nunez's friends, bought two boxes of ammunition.

The state presented Adrien Marrero (Marrero), a friend of Nunez's who was in Nunez's car on the day of the shooting. Marrero's recollection of the shooting differed greatly from defendant's. According to Marrero's testimony defendant approached Nunez's car outside the Burger King parking lot and asked Nunez if he had any problem with him. Nunez answered that there was no problem. However defendant replied that Nunez did in fact have a problem and he opened Nunez's car door. Marrero testified that Nunez then got out of his car and took off his jacket, whereupon defendant fired a shot at Nunez, then fired one shot into the ground, and then again shot at Nunez while Nunez was attempting to flee. The defendant raises four issues on appeal.

The defendant's first point on appeal is that the trial justice erred in refusing to allow defendant to call a witness who would have explained his failure to produce an important defense witness. During the presentation of defendant's case, defense counsel indicated that he wished to call Detective Steven Springer of the Providence police department to explain why Pimental, defendant's friend who was with him at the time of the incident, was unavailable to testify at the trial. In a sidebar colliquy defense counsel explained that Detective Springer would testify that on the day of the shooting he interviewed Pimental in connection with the investigation of the incident. He would further testify that subsequent to this interview the Providence police have been unable to locate Pimental and that his whereabouts at the time of the trial are unknown. Defense counsel's reason for presenting this testimony was to rebut any adverse inference the jury might draw against defendant for his failure to produce Pimental, who might corroborate defendant's version of the incident.

The trial justice granted an oral motion in limine made by the state on the grounds that Detective Springer's testimony concerning Pimental's unavailability would be immaterial and irrelevant.

██ This state has long held that prosecutorial comment on a defendant's failure to call a witness is improper. *State v. LaPointe*, 525 A.2d 913 (R.I. 1987); *State v. White*, 512 A.2d 1370 (R.I. 1986). The two reasons for this rule are " '[f]irst, such comment might suggest to the jury that defendant has some duty to produce witnesses or that he bears some burden of proof; second, the comment might erroneously suggest to the jury that defendant did not call the witnesses because he knew their testimony would be unfavorable.' " *State v. Jefferson*, 116 R.I. 124, 139, 353 A.2d 190, 199 (1976).

Although this is not a case in which a prosecutor improperly commented on an "empty chair," the reasoning behind the rule naturally extends to apply to the present situation. Even though a prosecutor is forbidden to comment on the failure of a defendant to present witnesses, this restriction will not prevent a jury from naturally drawing an adverse inference on a defendant's nonproduction of a critical witness.

In this case defendant testified that Pimental was with him at the time of the shooting and at prior incidents involving defendant and the victim. Pimental's unexplained absence from the trial could have cast some doubt in the jurors' minds upon defendant's account of the facts and could have led them to discredit defendant's uncorroborated account. We therefore conclude that the trial justice should have allowed defendant to question Springer about the police department's inability to locate Pimental. In so doing we accept the reasoning applied to a similar situation in *People v. Gomez*, 24 Cal. App. 3d 486, 100 Cal. Rptr. 896 (1972). "The unsupported testimony of a defendant as to an alibi is a weak defense. No matter what argument or explanatory instruction be given a jury understandably will look with suspicion on such a claim. If it can be bolstered by the

kind of independent testimony here offered, that suspicion may be somewhat reduced. A defendant is entitled to the kind of explanation herein involved." *Id.* at 491, 100 Cal. Rptr. at 898–99; *see also* 2 Wigmore, *Evidence* § 290 at 216 (Chadbourn rev. 1979) ("the party affected by the [adverse] inference may of course *explain* it away by showing circumstances which otherwise account for his failure to produce the witness[;] [t]here should be no limitation upon this right to explain, except that the trial judge is to be satisfied that the circumstances thus offered would, in ordinary logic and experience, furnish a plausible reason for nonproduction").

█ However, this was not a reversible error. In *State v. Burke*, 522 A.2d 725, 730 (R.I. 1987) this court held:

"The improper exclusion of evidence * * * is reversible error only if the excluded evidence would have had a controlling influence on a material aspect of the case. *State v. Calitri*, 459 A.2d 478 (R.I. 1983); *State v. Tavarozzi*, 446 A.2d 1048 (R.I. 1982). We shall not mandate a new trial unless the preclusion of testimony causes substantial injury to the party seeking its admission. *State v. Parker*, 472 A.2d 1206 (R.I. 1984). In determining whether the rejection of proffered testimony is prejudicial, this court must ascertain whether the rejected evidence reasonably could have altered the result. *State v. Almeida*, 111 R.I. 566, 304 A.2d 895 (1973)."

We are satisfied that Detective Springer's testimony concerning the police department's inability to locate Pimental would not have altered the jury's verdict.

The defendant was indicted for first-degree murder and convicted of voluntary manslaughter. He asserted that he shot the victim out of fear for his life. In returning a verdict of voluntary manslaughter the jury found defendant guilty of "an intentional homicide without malice aforethought in the heat of passion as a result of adequate provocation." *State v. Lillibridge*, 454 A.2d 237, 240 (R.I. 1982).

The defendant testified during the trial to a series of incidents and confrontations between him and the victim. They included break-ins of his car and apartment as well as three fistfights. He also testified that he was warned the night before the shooting that Nunez was going to kill him. His testimony describes the development of a growing animosity between him and the victim. He indicated at trial that Pimental accompanied him during two fistfights as well as on the day of the shooting.

The jurors did not believe that defendant was in fear of his life when he shot the victim as is evidenced by the verdict of voluntary manslaughter. However, without attempting to speculate on how they arrived at their decision it is fair to assume that they gave credence to his testimony concerning the previous break-ins and fistfights and the events on the day of the shooting which resulted in his conviction of the lesser included offense of manslaughter. Therefore it is reasonable to conclude that Pimental's unexplained absence did not cause the jury to discredit the portions of defendant's testimony that Pimental could have corroborated. Accordingly the trial justice erred by not allowing Detective Springer to testify that Pimental was unavailable to corroborate defendant's testimony. However, the error was harmless in that Detective Springer's testimony reasonably would not have influenced the jury to conclude that defendant was acting in fear of his life and as a result find him not guilty. *State v. Tribble*, 428 A.2d 1079 (R.I. 1981).

The defendant's next argument on appeal pertains to a courtroom demonstration involving the use of a gun. During cross-examination the state required defendant to step down from the witness stand, take hold of his gun, and demonstrate how the shooting had occurred.

During the course of the demonstration the state asked defendant to act out a series of movements relating to the use of the gun on the day of the shooting. The state requested that defendant show how he removed the gun from his car when Nunez approached him, with the prosecutor playing the part of the victim. The state also requested that defendant show how he

held the gun when he fired the first two shots into the ground near Nunez. The defendant responded that he did not remember how he grabbed the gun or held it. Defense counsel objected on the ground that the state was asking defendant to demonstrate something that he indicated he did not remember. The objection was overruled on the grounds that it was permissible cross-examination intended to refresh defendant's recollection of the incident.

The defendant was further required to approximate how he held the gun and pulled the trigger for the subsequent shots, although he had already stated that he did not remember how he had done so. In addition defendant was asked during the demonstration to answer other questions dealing with circumstances surrounding the shooting that did not directly relate to the handling of the gun. Again defendant repeated that he could not remember what had happened.

█ The defendant now claims that the trial justice committed reversible error in allowing the demonstration to continue. He argues that since one of the necessary elements of testimony is recollection, the demonstration should have been stopped once he testified that he did not remember how he had handled the gun. He claims that he was improperly prejudiced by being forced to continue the demonstration despite his repeated claim of lack of memory to certain events.

The defendant's theory at trial was that he feared for his life and acted in self-defense when he shot the victim. Therefore, the sequence of events surrounding the shooting was of extreme importance.

On direct examination defendant testified that during the confrontation the victim made a quick move as if he were "about to take something out." He recalled that he then fired two shots into the ground and fired a shot at Nunez but could not remember what happened after that.

On cross-examination the state submitted into evidence a statement defendant gave to the Providence police on the day of the shooting. In the statement, defendant told the police that he had shot at the victim. He also stated that as the victim turned away and tried to run, he kept shooting at him. In addition, he told the police, the victim had no weapons with him.

The ensuing demonstration pertaining to the sequence of events at the time of the shooting was entirely proper. The defendant was asked to demonstrate actions that he had previously described to the police but was unable to remember on direct examination. "[P]ermitted on cross-examination are questions designed to explain, contradict, or discredit any testimony given by a witness on direct examination, or to test his accuracy, memory, veracity, or credibility." *State v. Benevides*, 420 A.2d 65, 69 (R.I. 1980).

The trial justice was acting within his discretion in allowing this demonstration on cross-examination. "In this state, the scope of cross-examination is subject to control in the trial court's sound discretion." *State v. Bennett*, 122 R.I. 276, 278, 405 A.2d 1181, 1183, (1979). The defendant testified on direct examination that he believed the victim was going to shoot him and that as a result he acted so quickly that he could not remember his actions. This testimony contrasted with the statement he gave to the police on the day of the shooting that seemed to indicate defendant shot at an unarmed victim and continued to shoot as the victim tried to run away. The entire demonstration, therefore, despite defendant's apparent lack of memory, was relevant to the issue of defendant's credibility and was within the scope of permissible cross-examination.

█ The defendant's second argument pertaining to the courtroom demonstration involves an alleged breach of attorney-client confidentiality. Prior to the state's cross-examination of defendant, defense counsel requested an opportunity to prepare for the gun demonstration with defendant. He suggested that he and defendant be allowed to go down to the cell-block with the gun, where defendant could be searched by the marshals to ensure he

had no ammunition, and discuss the pending cross examination and demonstration.

The trial justice denied this request, citing the interest of public safety and his concern that the weapon might be tampered with if taken outside the courtroom. He ruled instead that defendant and defense counsel could confer and prepare for the gun demonstration in the empty courtroom with only the court clerk and the marshals present. Defense counsel objected to this suggestion on the grounds that conferring with his client in the presence of others impaired the confidentiality of the attorney-client relationship. As a result the trial justice ordered the court clerk and marshals not to reveal anything they would see or hear unless expressly ordered to do so by the court. Thereafter, defense counsel and defendant did confer in the presence of the court clerk and marshals.

The trial justice properly exercised his discretion in refusing defendant's request to take the gun to his cellblock to prepare for the demonstration. The gun had been admitted into evidence in the case. The trial justice's concerns that it might be tampered with, or more significantly might pose a safety hazard, if removed from the courtroom were legitimate concerns. His ruling was a reasonable solution to the problem he was faced with and we will not disturb it. *Matracia v. Matracia*, 119 R.I. 431, 378 A.2d 1388 (1977).

█ The defendant's third point on appeal is that the trial justice abused his discretion when sentencing defendant for manslaughter. At defendant's sentencing hearing the trial justice stated that if he had heard the case without a jury, his verdict would have been first-degree murder, not manslaughter. He then sentenced defendant to thirty years at the Adult Correctional Institutions. This sentence exceeded the statutory maximum in effect by ten years. The trial justice mistakenly believed that the maximum penalty for manslaughter had been recently increased from twenty years to thirty years. *See* G.L. 1956 (1981 Reenactment) § 11–23–3, as amended by P.L. 1985, ch. 421, § 1.

The defendant subsequently brought a motion under Rule 35 of the Superior Court Rules of Criminal Procedure to correct the sentence along with a motion that the trial justice recuse himself from resentencing defendant. Noting that the Governor had not yet approved the act of the General Assembly increasing the maximum sentence for manslaughter from twenty to thirty years at the time defendant was sentenced, the trial justice granted defendant's motion and vacated the sentence.

The thrust of defendant's motion to recuse the trial justice from resentencing was that by imposing the original thirty-year sentence, the trial justice was rejecting the finding of the jury that defendant was guilty of manslaughter and instead was basing the sentence on his personal belief that defendant was guilty of murder. The defendant claims this is sufficient evidence to establish that the trial justice was biased or prejudiced against defendant and therefore should not have resentenced him. The trial justice refused to recuse himself and sentenced defendant to twenty years.

To support his claim of prejudice defendant cites the trial justice's remarks at the sentencing hearing as well as the fact that the original sentence exceeded the statutory maximum for manslaughter by ten years. He also points out that he had no prior record and was nineteen years old at the time of the offense. He refers to the Superior Court benchmarks for sentencing that suggest a sentence for this crime ranging anywhere from five to twelve years would have been more reasonable.

"There are several relevant considerations the trial court may legitimately take into account in determining the appropriateness of a sentence to be imposed. The trial justice may consider the severity of the crime, the possibility of rehabilitation, the deterrence to others, and the appropriateness of the punishment for the crime involved." *State v. Ouimette*, 479 A.2d 702, 705 (R.I. 1984).

It was entirely proper for the trial justice in the present case, when determining defendant's sentence, to take into account the testimony that defendant went to the scene

of the crime with a loaded gun, engaged in a confrontation with the victim, and shot him in the side as he was attempting to flee. After considering these facts, the trial justice determined that the maximum penalty for the crime of manslaughter was appropriate.

The defendant relies on *State v. Nunes,* 99 R.I. 1, 205 A.2d 24 (1964), where a trial justice, in passing on a motion to revoke bail, stated that the defendant's acquittal of a prior crime was a miscarriage of justice. This court ordered a new trial on the ground that the trial justice's remarks "disclose[d] a prejudicial state of mind on the part of the judge that reasonably must be considered to have existed during the course of the trial." *Id.* at 6, 205 A.2d at 27. We have also granted a new trial when the trial justice's statements during a trial served to negate the impartiality required of judicial officers during a trial. *State v. Nordstrom,* 122 R.I. 412, 408 A.2d 601 (1979). In the present case there is nothing in the record to suggest that defendant's right to a fair trial was prejudiced in any way. In fact, defense counsel indicated at the hearing to recuse that the trial justice's conduct during the trial was extremely fair and impartial.

Although the trial justice stated at the time of sentencing that he believed defendant to be guilty of first-degree murder, the fact is that he sentenced defendant within the statutory limits for manslaughter, the crime for which defendant was convicted. "[T]his court has the power to review a sentence alleged to be excessive although within statutory limits * * *." *State v. Rollins,* 116 R.I. 528, 539, 359 A.2d 315, 321 (1976). However, "[w]e have emphasized that the inherent power to review sentences should be utilized only in the exceptional case in the context of a strong policy against interference with the discretion exercised by the trial court in passing sentence. Thus the power should be exercised only when the sentence is without justification and grossly disparate from sentences generally imposed for similar offenses." *State v. Giorgi,* 121 R.I. 280, 282, 397 A.2d 898, 899 (1979).

Here, the trial justice did not reject the factual conclusions reached by the jury. Rather he considered the facts and circumstances of the case and imposed the statutory maximum penalty, based upon the jury's verdict. We are therefore extremely reluctant to interfere with the trial justice's discretion in passing sentence on this defendant.

The defendant's last point on appeal is that the trial justice erred in refusing to suppress statements made by defendant at the Providence police station. Shortly after the shooting Detective James Higgins and Captain John Power of the Providence police department went to defendant's apartment on Adelaide Avenue. At the suppression hearing Detective Higgins testified that defendant voluntarily met the policemen at the front door of his apartment where he was placed under arrest and informed of his *Miranda* rights. As they headed to the patrol car defendant stated "I shoot the bastard. He stole from my car." At that point Captain Power asked defendant if he understood his right to remain silent and his right to an attorney. The defendant replied that he wanted to get it over with and would show the policeman where the gun was. Captain Power again asked defendant if he understood his rights, to which question defendant responded, "I will get a lawyer at the station." They returned to the apartment and defendant directed them to the gun.

At the police station defendant was placed in an interview room. Detective John McGeheraty was assigned to guard him. Detective McGeheraty testified at the suppression hearing that after he introduced himself to defendant, a conversation evolved between the two concerning the difficulty the detective was encountering in his Spanish course at Brown University. He testified that defendant helped him enunciate a few words in Spanish and that during the course of this conversation defendant began to talk to him about the incidents of that day. At that point the detective halted the conversation and informed defendant that if he was going to discuss the incident, the detective was going to have to inform him of his constitu-

tional rights. The detective left the room and returned with a *Miranda* warning form. The defendant signed the form, indicating that he understood his rights and then gave a statement to the detective concerning the shooting. After the detective took defendant's statement, he reviewed it with an assistant attorney general who suggested that further questions be asked. The defendant was again informed of his rights and answered the further questions.

At the suppression hearing defendant testified that he was not informed of his rights upon being placed under arrest at his apartment. He also stated that he asked to make a phone call to an attorney but was told he could do so at the station. In addition, defendant testified that he was informed by a detective at the police station that it would be better for him if he made a statement.

The trial justice denied defendant's motion to suppress the statements. He found that defendant had been advised of his rights when he was arrested at his apartment and that defendant did not invoke his right to counsel when he stated that he would get a lawyer at the station. He concluded that no interrogation had begun until defendant began to talk about the incident, at which point he was stopped and informed of his rights, which he knowingly and voluntarily waived.

■ The defendant argues that the trial justice erred in denying his motion to suppress because the police interrogated him at the station after he had invoked his right to counsel. Even if we assume for the purpose of argument that defendant's statement to the police at his apartment served to invoke his right to counsel we do not agree with defendant's theory.

The defendant claims that his conversation with Detective McGeheraty constituted an interrogation which violated his previously invoked right to counsel. Interrogation is defined as not only express questioning but also as "any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S.

291, 301, 100 S. Ct. 1682, 1689–90, 64 L. Ed. 2d 297, 308 (1980). The Court further explained however that the police "cannot be held accountable for the unforeseeable results of their words or actions * * *." *Id.* at 302, 100 S. Ct. at 1690, 64 L. Ed. 2d at 308.

We find nothing in this record to indicate that defendant was subjected to interrogation when he arrived at the police station after his arrest. We cannot say Detective McGeheraty should have known that his conversation with defendant concerning his Spanish class and the pronunciation of certain Spanish words was reasonably likely to prompt defendant to talk about the shooting. *See State v. Lionberg,* 533 A.2d 1172 (R.I. 1987). The fact that defendant gave a statement concerning the incident can only be seen as an unforeseeable result of the conversation.

■ Turning to the question of whether defendant initiated conversation with the police regarding the shooting the United States Supreme Court has held that, "an accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386 (1981).

If defendant did initiate further communication with the police the second inquiry in determining the admissibility of his statement is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S. Ct. 2830, 2835, 77 L. Ed. 2d 405, 413 (1983) (quoting *Edwards v. Arizona,* 451 U.S. at 486 n.9, 101 S. Ct. at 1885 n.9, 68 L. Ed. 2d at 387 n.9).

We are satisfied that the defendant both initiated the discussion concerning the shooting and knowingly and intelligently waived his right to counsel. Detective McGeheraty's uncontradicted testimony clearly shows that the defendant initiated discussion of the incident during the course of their conversation concerning the pronounciation of Spanish words.

 Second, the record shows the trial justice concluded that there was no evidence of any threats, promises or coercion on the part of the police regarding the defendant's waiver of rights. He determined that the defendant was advised of his constitutional rights before making each statement and that he understood his rights.[1] Therefore we concur with the trial justice's findings that there is no evidence that his waiver of rights was anything less than voluntary and intelligent.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed.

---

1. Although defendant testified at the suppression hearing that he did not know what the word "murder" meant the trial justice found this evidence was "incredible" and did not accept it.