**STATE**

v.

**Gary SOUZA.**

**No. 96–359–C.A.**

Supreme Court of Rhode Island.

March 25, 1998.

Aaron L. Weisman, Providence, for plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

Convicted for sexually abusing a child on multiple occasions, the defendant, Gary Souza, challenges on appeal the trial justice's rulings (1) preventing his introduction of certain evidence concerning the close and ostensibly normal nature of his relationship with the complaining witness and (2) precluding his attorney's attempt to refresh the complaining witness's recollection with an investigator's handwritten notes documenting a pretrial interview with the complainant.

After a Superior Court jury trial, the defendant was convicted of multiple counts of first-and second-degree child molestation sexual assault and first-degree sexual assault upon a young girl (complainant). The defendant had been dating the complainant's mother, when he moved into a Central Falls apartment shared by complainant, who was then only six-years old, and her mother. Starting in 1984 when complainant was eight years old and continuing until 1991 when she was fifteen, defendant sexually molested her on various occasions, including two forcible rapes.

Because we conclude that defendant's contentions on appeal do not warrant a new trial, we affirm his convictions for the reasons explained below.

## I

### Exclusion of Evidence Concerning the Relationship between Complainant and Defendant

The trial justice sustained several of the state's objections at trial to defendant's repeated attempts to elicit testimony from various witnesses about the apparently close and happy relationship that existed between defendant and complainant while they were living together in the same apartment. The defendant claims on appeal that these rulings not only were abuses of discretion but also served to deny him his constitutional rights to a meaningful opportunity to present a defense. For the purpose of resolving this issue, we shall assume *dubitante*—and without deciding—that evidence of an apparently happy and normal relationship between an accused child molester and the child victim is relevant to whether the accused is guilty of sexually abusing the child on various occasions when they were alone together.

We have carefully examined the various evidentiary rulings on this subject about which defendant complains, and we conclude that none of them constitutes reversible error. Because the questions at issue lacked the proper foundation, were improper as a matter of form, or called for hearsay or cumulative information, we are unpersuaded that the trial justice abused her discretion in sustaining objections to these questions.

The defendant's direct examination of Alex Veveiros, a long-time friend of defendant, is illustrative of the objectionable questioning by defense counsel. It also shows that defendant was indeed allowed to elicit testimony in support of his close parent-child relationship theory after defense counsel laid the proper foundation for doing so and framed her queries appropriately:

"**Defense Counsel:** And have you ever, during—from 1982 to 1992, sir, did you ever have the opportunity to see Mr. Souza in the presence of [complainant]?

"**Witness:** Yes, I have.

"**Defense Counsel:** And approximately how often would you see the two of them together?

"**Witness:** In passing, because I didn't associate all the time with him.

"**Defense Counsel:** Ever have an opportunity to see them at home together?

"**Witness:** Yes.

"**Defense Counsel:** Did you ever have an opportunity to see them out together?

"**Witness:** Yes, on occasion.

"**Defense Counsel:** Can you describe the demeanor of [complainant] when you saw her in the presence of Mr. Souza?

"**Prosecutor:** Objection, your Honor.

"**The Court:** Sustained.

"**Defense Counsel:** Did [complainant] ever appear to be afraid?

"**Prosecutor:** Objection.

\*　　\*　　\*　　\*　　\*　　\*

"**Defense Counsel:** On those occasions when you saw Mr. Souza and [complainant] together can you tell us how Mr. Souza would act towards her?

"**Prosecutor:** Objection, your Honor.

"**The Court:** Sustained.

"**Defense Counsel:** Did you ever see [complainant] go to Mr. Souza with a problem?

"**Prosecutor:** Objection, your Honor.

\*　　\*　　\*　　\*　　\*　　\*

"**Defense Counsel:** I'd like to approach the side bar, your Honor.

\*　　\*　　\*　　\*　　\*　　\*

"This is a witness who has personal knowledge, his own observation of the relationship between Souza and [complainant]. The state has put into evidence the fact that [complainant] was too afraid to come forward because she had taken an oath. She was afraid because my client allegedly threatened her that if he goes down, she's going to go down. And this is a witness who knew the both of them—Mr. Souza for twenty years, [complainant] for ten years—during the time of the relationship, Judge, who saw these two together. His testimony as to the demeanor—

"**The Court:** What is he going to say?

"**Defense Counsel:** Is irrelevant.

"**The Court:** What is he going to say, he has known them in passing? For one thing he has seen them in passing because he didn't socialize with them. You haven't laid a foundation as to time, you swept with a very broad brush, which is a ten-year period, and I don't find that its relevant. I'll hear you, Mr. Daly.

"**Prosecutor:** My main objection is relevance. But second objection was to the form of the question. There's no relationship in 1982. The relationship in '82 may be somewhat different than '92, and the question is, therefore, not formed properly.

"**The Court:** Objection sustained.

"**Defense Counsel:** Then, Judge, I will try to go back and lay that foundation."

Subsequently, after establishing a foundation that Veveiros lived for two months in 1992 in the home of Souza and complainant's mother, defense counsel was allowed to proceed with questions on the parent-child relationship:

"**Defense Counsel:** During that period [in 1992] did you have the opportunity to observe the demeanor of Mr. Souza with [complainant]?

"**Witness:** Just like father and daughter."

And because the state conceded that the complainant-defendant relationship was a close one even when the sexual abuse was occurring, this fact hardly constituted a disputed issue. Indeed the evidence presented by both the state and defendant showed that complainant ostensibly looked upon defendant as her father and that he appeared to treat her as he would his own daughter. And through various witnesses defendant was allowed to introduce evidence directed to this very same point.

For example, defendant was able to introduce testimony on the parent-child relationship through Louis Villa, the ex-brother-in-law of defendant and the former landlord of the building where the Souza family lived:

"**Defense Counsel:** Mr. Villa, during those times that you saw Mr. Souza and [complainant] together, can you tell us what your observations were as to how she acted towards him?

"**Witness:** Like a father.

"**Defense Counsel:** During those ten years, sir, or approximately ten years, that you owned the house on Moore Street, did you ever observe anything that would lead you to believe that there was a serious problem between Mr. Souza and [complainant]?

"**Prosecutor:** Objection, your Honor.

"**The Court:** Sustained.

"**Defense Counsel:** Did [complainant] ever tell you that she had a problem with Mr. Souza?

"**Witness:** No, she didn't."

■ Although the trial justice periodically prevented defense witnesses from repeating just how close a relationship these two individuals seemed to have with each other, it appears to us that she was acting within her discretion in doing so because this close-relationship evidence was largely cumulative and undisputed. *See* R.I.R.Evid. 403; *State v. Cardoza,* 649 A.2d 745, 749 (R.I.1994). Moreover, despite the trial justice's rulings sustaining various objections to the defendant's attempts to introduce additional close-relationship testimony, both the state and the defense were able to present ample evidence on this subject. Thus we are of the opinion that defendant did not suffer any prejudice from the trial justice's exclusion of additional evidence directed to establishing this same undisputed point. *See, e.g., State v. Nardolillo,* 698 A.2d 195, 202 (R.I.1997); *State v. D'Agostino,* 691 A.2d 561, 563 (R.I.1997). Although criminal defendants should be allowed reasonable latitude in presenting their defenses to the charges lodged against them, they do not have a constitutional license to carry limitless quantities of evidentiary coal to Newcastle.

We have long held that a trial justice possesses wide discretion in ruling on the admissibility of evidence at trial. This is especially true when the trial justice acts to control the quantum and nature of the evidence submitted on issues that are not in serious dispute. Although we believe that trial justices should generally err on the side of allowing criminal defendants a reasonable opportunity to present their cases and defenses as they see fit to do so—even at the risk of duplicating or repeating some eviden-

tiary points that are either undisputed or already established by other testimony—we cannot say that this trial justice abused her discretion by preventing the unnecessary cumulation of evidence upon a factual path that was as well traversed and as beaten down as was this one.

## II

### The Trial Justice's Failure to Permit Defense Counsel's Use of a Government Report to Refresh Complainant's Recollection about What She Had Previously Stated to a Social Worker

The complainant testified that in 1984, when she was about eight years old, defendant would at times hit her with his hands or with a belt. During cross-examination the defense sought to impeach complainant by bringing to her attention that in 1989—five years after the discipline that she said had occurred in 1984—she apparently had told a Department of Children, Youth and Families investigator that she was "not generally hit— [with] rare exception" and that "no * * * objects" were used by defendant when he disciplined her. Although the trial justice gave defense counsel free rein to ask complainant about the information contained in the investigator's contemporaneous notes, she would not permit defense counsel to attempt to "refresh" her recollection by showing her what the investigator had written in those notes. The defendant argues that he was entitled, under Rule 612 of the Rhode Island Rules of Evidence, to attempt to refresh complainant's recollection with the report. He claims that if he had been permitted to do so and if complainant had stated that her memory was refreshed but then denied making the statement to the investigator, he would have been able to impeach her credibility, possibly by calling the investigator to the stand at some later point.

■ We agree with defendant's argument that the trial justice erred in not allowing defendant to attempt to refresh complainant's memory with the investigator's report. When attempting to refresh a witness's memory, the examining attorney need not use a document that has been written either by the witness or under his or her direction. Rather, Rule 612 merely refers to using "a

writing" to refresh a witness's memory for the purpose of testifying. The Advisory Committee's notes to the Rule comport with a liberal interpretation of what types and kinds of writings may be utilized for this purpose:

"Since it is not the writing but the witness' personal knowledge only refreshed by the writing that is offered into evidence by the proponent there seems little reason to place categorical restrictions on the sort of writing which may be used." Rule 612 Advisory Comm. notes at 956.

Moreover, the Advisory Committee's interpretation of Rule 612's allowance of a third-party's writing to refresh a witness's recollection is consistent with early Rhode Island case law:

"[A] witness * * * is permitted to refresh and *assist his memory by the use of a written instrument,* memorandum, or entry in a book, and may be compelled to do so if the writing is present in court. *It does not seem to be necessary that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak to the facts from his own recollection.* * * * And it is not necessary that the writing thus used to refresh the memory should itself be admissible in evidence." *Welch & Co. v. Greene,* 24 R.I. 515, 521, 54 A. 54, 56–57 (1902) (quoting 1 *Greenleaf on Evidence* § 436 (15th ed.)). (First emphasis in original; second emphasis added.)

Thus any writing or object may be used in an effort to refresh a witness's recollection— not merely his or her own writing or statement. As Judge Learned Hand put it in *United States v. Rappy,* 157 F.2d 964, 967 (2d Cir.1946), *cert. denied,* 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed. 688 (1947), "Anything may in fact revive a memory: a song, a scent, a photograph, [an] allusion, even a past statement known to be false."

■ Nevertheless, we also hold that the trial justice's erroneous refusal to permit defense counsel's attempt to refresh complainant's recollection with the investigator's notes of their 1989 conversation does not constitute reversible error. The only statement in the investigator's notes that was arguably con-

tradictory of complainant's in-court testimony was the indication therein that no objects had been used to discipline complainant. However, complainant's in-court testimony that defendant would on occasion in 1984 (when she was eight) strike her with a belt is not necessarily in conflict with the note's indication that when complainant spoke to the investigator in 1989 (when she was thirteen), objects were not being used to discipline her.

Moreover, even if complainant's memory had been refreshed by the investigator's 1989 notes, or even if the investigator had been called by defendant to contradict complainant on this issue (she was not), the trial justice would have had the discretion to preclude the investigator from testifying to that statement in the event she deemed it was collateral in nature. *See State v. Tutt,* 622 A.2d 459, 462 (R.I.1993) ("Our case law has consistently reaffirmed th[e] proposition * * * that '[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness' "). *See also State v. Filuminia,* 668 A.2d 336, 338 (R.I.1995) (extrinsic evidence deemed not collateral because issues raised there "directly bore on defendant's guilt or innocence"); *State v. Bowden,* 439 A.2d 263, 267–68 (R.I.1982) (impeachment of witness's credibility by extrinsic evidence deemed improper because the disputed matter did not tend to establish a material proposition in the case, nor did it have any "meaningful bearing" on the defendant's guilt or innocence); 3A *Wigmore on Evidence,* § 1003 (Chadbourn rev.1970) (the only bright-line test of collateralness is whether the fact could have been shown in evidence *"for any purpose independently of the contradiction"*).

However, extrinsic evidence of what complainant said to the investigator in 1989 may have been admissible for purposes independent of the contradiction: (1) if it was relevant to some other material issue in the case or (2) if it tended to impeach some specific testimonial quality of the complainant. *See generally* 3A *Wigmore on Evidence,* at §§ 1005, 1006. But here defendant made no attempt to call the investigator to the stand for any purpose (let alone for one that was unrelated to impeachment)—for example, to show that complainant's 1989 statement to the investigator about defendant's disciplinary practices supported the defense's normal child-parent relationship theory.[1] Further, the trial justice did allow defense counsel to ask complainant about the substance of the statements contained in the report.

Finally, given the substantial evidence of the defendant's guilt—in particular the heinous forcible rapes during 1991—any error in refusing to permit defense counsel to use the investigator's report to refresh the complainant's recollection about whether the defendant had ever used objects to discipline her appears to us to have been harmless beyond a reasonable doubt.

### Conclusion

For these reasons we affirm the Superior Court's judgment and dismiss the defendant's appeal.

BOURCIER and GOLDBERG, JJ., did not participate.

---

1. We also note that although defendant could have attempted to call the investigator in his case in chief for the purpose of introducing a prior inconsistent statement of complainant, he failed to do so. Assuming arguendo that complainant's in-court testimony and her prior statements to the investigator were inconsistent, *see State v. Fales,* 114 R.I. 519, 521, 335 A.2d 920, 921 (1975) (requirement of legally cognizable inconsistency between testimony of witness and prior statement sought to be introduced to impeach that witness), and that defendant could establish that the issue of physical abuse by objects was not collateral to the issue of defendant's guilt or

innocence of sexual assault and molestation charges, *see State v. Brown,* 574 A.2d 745, 749 (R.I.1990) (witness may not be impeached on collateral matters by introduction of extrinsic evidence), a proper foundation was laid for defendant to introduce extrinsic evidence of complainant's prior inconsistent statement because complainant's attention was directed to the circumstances in which the prior statement was made and complainant did not admit to her alleged prior statement that defendant had never used objects to hit her. *See State v. Chartier,* 619 A.2d 1119, 1125–26 (R.I.1993); *Fales,* 114 R.I. at 522, 335 A.2d at 922.