## STATE

v.

## Juan MARTINEZ.

No. 2002–268–C.A.

Supreme Court of Rhode Island.

June 9, 2003.

Lauren Sandler Zurier/Aaron Weisman, Providence, for Plaintiff.

Janice Weisfeld/Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG and FLAHERTY, JJ.

## OPINION

FLAHERTY, Justice.

The defendant, Juan Martinez (Martinez), was indicted by a grand jury for the crime of first-degree sexual assault against a fourteen-year old child. He later was convicted by a jury for that crime and was sentenced to a forty-year term of imprisonment, fifteen years of which were suspended with probation. He timely appealed from his judgment of conviction.

### Facts/Procedural History

In early August 1998, the victim, Jane Doe,[1] (Jane), was staying with her eighteen-year old half-sister, Heather, in Johnston, Rhode Island. Heather lived in Johnston with her father and her two-year old daughter. On the evening of August 4, 1998, Jane went with Heather to seek out Heather's on-again, off-again boyfriend, Tony Brache (Tony), who lived with his father in a basement apartment on Calder Street in Providence. Heather's child was left in the care of Heather's father. Because Heather's car had a tendency to overheat, they often had to stop and wait for the engine to cool.

Heather and Tony were having difficulties in their relationship, and Jane, who frequently acted as their mediator, intended to speak to Tony on Heather's behalf. However, when they arrived at the Calder Street apartment, they discovered that Tony was not at home. Meanwhile, Heather's car was overheating, so they obtained water from Tony's neighbor and friend, Emmanuel Rivas (Manny). The girls knew Manny from previous encounters. He lived with his mother and siblings on the first floor of the Calder Street property. After the car engine cooled down, the girls set out to find Tony, but to no avail.

The following day, the girls returned to Tony's apartment, this time with Heather's child.[2] Again, he was not at home. Knowing that Tony's father was away, they prevailed upon Manny to break the lock to the apartment and went inside. According to Jane, this was her first time in the apartment. They snooped around for a while and then went outside to wait for Tony to return. It was at this time that Jane first encountered Martinez, who was working on his car in the driveway. Jane understood Martinez to be Manny's father or stepfather.

Subsequently, Tony arrived home. He was furious when he discovered the broken lock and refused to speak to Heather. He then left to buy a new lock. Heather returned to Johnston with Manny and her toddler, since she had to feed the child. Jane, however, remained behind, hoping that she could placate Tony when he re-

---

1. Jane is a pseudonym. We have changed the victim's name to protect her privacy.

2. The following facts rely, in large part, on Jane's account of the events.

turned. When Tony arrived back, he ignored Jane, fixed the lock and then departed, leaving her alone at the Calder Street property. Jane then decided to wait in the driveway for Heather's return. Subsequently, Manny's brother, Alex, informed her that she could not remain there and he escorted her to the end of the street. Alex stayed with her until Martinez drove up in his car and spoke to him in Spanish. When Martinez drove away, Alex told Jane to sit on the steps of the building across the street and then he ran back to his apartment.

After awhile, Martinez returned in his vehicle and told Jane that Heather was having car trouble. He offered to take her to where Heather was located and Jane accepted the offer. However, Martinez drove around Providence for awhile before telling Jane that he had to "go pay someone some money" and then he headed for Johnston. While they were in the car, Martinez repeatedly asked Jane whether she would kiss him if he paid her money. She told him that she would not. He then asked her whether she was having a relationship with Manny, which she denied. Thereafter, Martinez drove into the parking lot of a motel called the Johnston Motor Lodge. At that point, his pager went off, so he made a telephone call from a nearby payphone, conversing in Spanish. When he returned to the car, he told Jane that Heather and Manny were going to meet them at the motel. Martinez then rented a room under his own name, giving his automobile license plate number and using his driver's license for identification.

Martinez then drove around to the back of the building, parked his car and entered Room 204. Jane remained in the car. Realizing that she had not followed him, he lured her into the room by asking her to bring him some papers from the car. Once inside, Jane sat in a chair near the door while Martinez sat about two feet away on the edge of the bed. Claiming that he wanted to look out the window for Heather and Manny, he asked her to trade places. Then he repeatedly attempted to kiss her. Jane unsuccessfully attempted to fend off his advances, but she was not strong enough. He immobilized her arms, pushed her down onto the bed and got on top of her. When she tried to push him away, he threatened her. He put his hands up under her blouse and bra and then wrenched off her pants and underwear. He vaginally penetrated Jane and later ejaculated on her stomach.

Having finished gratifying himself, Martinez suggested that they both clean themselves up and then he went into the bathroom. Jane immediately seized upon the opportunity to escape, and hurriedly dressed herself. She raced out of the room, leaving the door open behind her. Jane first went to the motel office to telephone the police. However, the motel clerk could not understand her frantic request. Frustrated, Jane ran across the street to a Food Mart. The cashier at the store immediately called the police upon realizing what Jane was saying. Meanwhile, Jane went into the bathroom of the store to attempt to clean herself with a paper towel.

The police responded quickly. When they arrived they found Jane to be hysterical, shaking, and crying. She showed the police where the attack had taken place. The officers noticed that the door to Room 204 was open. In the room, the police observed that the bed was rumpled and they found a wet cloth and a pair of men's underpants. However, Martinez and his car were nowhere to be seen. At that point, Jane then was taken to Hasbro Children's Hospital for examination and treatment.

Jane's physical examination revealed fresh bruising on her forearms consistent with her account of how Martinez had held her arms. In addition, there was fresh bruising on her left inner thigh. Dr. Christine Barron testified that although Jane's hymen was intact, intercourse could not be ruled out because her hymen had been "estrogenized" and was more elastic than normal. The doctor further testified that such a condition is not an unusual for a girl of Jane's age. Doctor Barron also testified that she found positive traces of seminal fluid on Jane's stomach, in her pubic hair and in her vaginal area. In addition, positive traces of seminal fluid also were found on Jane's underwear, jeans and blouse. Jane denied having consensual sex within the preceding seventy-two hours.

The following day, the police showed a photographic array to both Jane and Heather. Jane positively identified Martinez as the man who sexually assaulted her and Heather positively identified him as the man she met at the Calder Street residence. A warrant soon was issued for his arrest, but Martinez was nowhere to be found. Almost one year later, Heather spotted Martinez at a baby shower and found out where he lived. Heather informed the police of Martinez's whereabouts on July 5, 1999. At approximately 9:30 that night, police officers from Johnston and Providence went to his residence on Public Street in Providence.

Providence Police Officer Gina DiFillippo testified that she positioned herself around the back of the house while other police officers approached the front. While she was at her post, Officer DiFillippo observed a man climbing out a first-floor window "feet first." As he was hanging from the windowsill, but before he had a chance to jump down, Officer DiFillippo apprehended the man. She asked the man

his name, to which he replied "Jose Rodriguez." Later, he admitted that he, in fact, was Juan Martinez. At trial, former Johnston Police Officer Michael A. Calenda testified that as they were booking him, Martinez blurted out that "the girl in the room was 18 and she was his girlfriend."

Martinez subsequently was tried and convicted of first-degree sexual assault. He has appealed that conviction, raising several issues on appeal. Additional facts will be supplied as needed to address those issues.

### Analysis

Martinez has raised several issues on appeal. First, he contends that the trial justice erred in precluding testimony from two witnesses who he maintains would have impeached Jane's testimony by specific contradiction. Next, he asserts that the trial justice erred in preventing him from eliciting testimony that had analysis been conducted on the DNA, hair, and fiber samples, the results possibly could have excluded him as the source of that evidence. Finally, Martinez maintains that the trial justice erred at his sentencing by not postponing the hearing to allow an inaccurate presentence report to be corrected and by completely disregarding the inaccurate report before imposing sentence.

### 1. Impeachment by Specific Contradiction

After the state closed its case-in-chief, Martinez amended his answer to the state's request for discovery and alibi. His amended response proposed putting Tony and Alex on the stand to impeach Jane's testimony by specific contradiction. The state did not object to the lateness of the amended answer pursuant to Rule 16(c) of the Superior Court Rules of Criminal Procedure. *See State v. Nardolillo,*

698 A.2d 195 (R.I.1997). Rather, it responded by filing a motion *in limine* to preclude the witnesses from testifying about collateral matters that had no bearing on the issue of the innocence or guilt of Martinez. The state further relied on G.L. 1956 § 11–37–13, the rape shield statute, as a ground to exclude the proffered testimony. After a hearing, the trial justice granted the state's motion *in limine*. Martinez is appealing that ruling.

"The motion in limine 'has become widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial.'" *State v. Torres,* 787 A.2d 1214, 1219–20 (R.I.2002) (quoting *Ferguson v. Marshall Contractors, Inc.,* 745 A.2d 147, 150 (R.I. 2000)). "Its purpose 'is to prevent the proponent of potentially prejudicial matter from displaying it to the jury * * * in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.'" *Id.* at 1220 (quoting *State v. Fernandes,* 526 A.2d 495, 500 (R.I.1987)). With respect to the granting or denial of a motion *in limine,* "[t]he only consideration on appeal is 'whether the evidence and cross-examination was proper and admissible, and if not, whether the error was sufficiently prejudicial to warrant reversal.'" *Id.* (quoting *Fernandes,* 526 A.2d at 500). Thus, the crucial question before us is whether the testimony that the state challenged was properly admissible at trial.

In his supplemental answer, Martinez proposed that Tony would testify as follows:

"On the morning of August 5, 1998 he came home (having spent the night at a friend's house) and discovered that Heather, [Jane] and Heather's baby were in his basement apartment. He told them to get out. The lock to the apartment had been broken. When he went upstairs to his car Heather gave him a box with speakers, a box that he had discovered was missing from his car when he had left his friend's house that morning. He told them he did not want to see them anymore. He went out to buy a new lock and when he returned he saw [Jane] at the front of the house. She came back in while he fixed the lock and he told her she should leave too. He was angry that they had his speakers and broken into his apartment. She left. He later saw her on the front steps and, still later, in front of the school down the street. Both Heather and [Jane] had been in his apartment (with his consent) on previous occasions, including the night of August 3–4 when he, Heather, [Jane] and [Manny] spent most of the night in his apartment and also drove to the beach in Newport."

The testimony Martinez intended to elicit from Alex was as follows:

"He was fourteen in August, 1998. He knew Heather to be Tony's girlfriend, and he thought his brother [Manny] was going out with [Jane]. Before Tony came home that morning Heather and [Jane] asked his mother for a screwdriver so they could fix the broken lock. When he saw Tony the next morning only [Jane] was there. She sat at the front of the house and then left. He did not tell her to leave. She then walked to school up the street. She said she was waiting for her sister to return so that they could 'go puff.' He went back to the house."

In granting the state's motion *in limine,* the trial justice found that the proffered testimony was collateral and served as "a smoke screen" to the "real issues in this case." Martinez contends that the proffered testimony would have impeached Jane's testimony by specific contradiction. The state maintains that the testimony

properly was excluded as collateral evidence and additionally contends that the allegation that Manny was going out with Jane also was precluded by the rape shield statute, § 11–37–13.

Rule 608(b) of the Rhode Island Rules of Evidence provides, in pertinent part, that:

> "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility * * * may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

■ We consistently have stated in the past that normally "[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness." *State v. Tutt*, 622 A.2d 459, 462 (R.I.1993) (quoting *State v. Brown*, 574 A.2d 745, 749 (R.I.1990)).[3] "[T]he only bright-line test of collateralness is whether the fact could have been shown in evidence *'for any purpose independently of the contradiction* [.]'" *State v. Souza*, 708 A.2d 899, 904 (R.I.1998) (quoting 3A *Wigmore on Evidence*, § 1003 (Chadbourn rev.1970)). Collateral evidence may be "admissible for purposes independent of the contradiction: (1) if it was relevant to some other material issue in the case or (2) if it tended to impeach some specific testimonial quality of the complainant." *Id.*

In this case, the proffered testimony from Tony and Alex concerned matters that were supposed to have occurred several hours before the alleged sexual assault occurred. None of it was related to the sexual assault itself and, because its sole purpose was to impeach Jane on collateral matters, the trial justice did not err in granting the state's motion *in limine* to exclude the proffered testimony.

■ Further, Rule 602 of the Rhode Island Rules of evidence provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Thus without having to address the propriety of the assertion that Alex "thought his brother [Manny] was going out with [Jane,]" we conclude that defense counsel failed to produce any evidence demonstrating that this proffered testimony was based on Alex's personal knowledge and his testimony was properly excluded on that ground as well.

■ Finally, "[a] trial justice has broad discretion to exclude evidence under Rule 403 of the Rhode Island Rules of Evidence 'that, if admitted, would be misleading or unduly prejudicial.'" *State v. Wright*, 817 A.2d 600, 608 (R.I.2003) (quoting *State v. Rice*, 755 A.2d 137, 152 (R.I.2000)). Certainly, the unsupported collateral evidence proposed in this case would have been misleading and unduly prejudicial to a jury. Consequently, the testimony properly could have been excluded under Rule 403.

### 2. The Exclusion of DNA, Hair and Fiber Analysis Testimony

■ During the trial, a forensic scientist and a forensic serologist from the De-

---

**3.** An exception to this rule is where the witness also is a defendant. *State v. Tutt*, 622 A.2d 459 (R.I.1993).

partment of Health testified about their analysis of the rape evidence kit previously submitted to the department by the police. They found evidence of seminal fluid on a vaginal swab taken from Jane on the day of the rape, as well as on the inner crotch of her jeans, the front of her panties, and on her blouse. During cross examination, the forensic scientist testified that no DNA, hair or fiber analysis was performed on the samples. Defense counsel attempted to elicit testimony from both witnesses as to whether the results from a DNA test might have excluded Martinez as the source of the seminal fluid. The trial justice sustained the state's objection.

Martinez contends that because seminal fluid can be found on a person up to seventy-two hours after intercourse, DNA testing "might have excluded Mr. Martinez as the source of the semen had such testing been done." The state counters that such testimony would have violated the rape shield law. Because we consider the area of inquiry to have no probative value, we need not address the state's rape shield law concerns.

 "The improper exclusion of evidence * * * is reversible error only if the excluded evidence 'would have had a controlling influence on a material aspect of the case.'" *State v. Gil*, 543 A.2d 1296, 1299 (R.I.1988) (quoting *State v. Calitri*, 459 A.2d 478 (R.I.1983) and *State v. Tavarozzi*, 446 A.2d 1048 (R.I.1982)). "Exclusion of such evidence is not reversible error unless the trial justice abused his discretion, thereby causing substantial injury to the party seeking its admission." *State v. Parker*, 472 A.2d 1206, 1210 (R.I. 1984) (citing *State v. Benevides*, 420 A.2d 65, 69 (R.I.1980) and *Gaglione v. Cardi*, 120 R.I. 534, 538, 388 A.2d 361, 363 (1978)). "In determining whether the rejection of proffered testimony is prejudicial, this court must ascertain whether the rejected evidence reasonably could have altered the result." *Gil*, 543 A.2d at 1299 (quoting *State v. Burke*, 522 A.2d 725, 730 (R.I.1987)).

 "One threshold question in determining if certain evidence should be admitted is whether it had probative value." *Parker*, 472 A.2d at 1210. "Proffered evidence is considered probative and relevant 'when it renders the existence of the fact sought to be proven more or less probable than it would have been without the evidence.'" *State v. Wilding*, 740 A.2d 1235, 1242 (R.I.1999) (quoting *State v. Kaner*, 463 A.2d 1348, 1351 (R.I.1983)).

In *Parker*, this Court determined that the trial justice properly precluded the defendant from questioning the police about whether they had found fingerprints at the scene of the crime because there was "no offer of proof by defendant that the police did dust for fingerprints and found none or found some other than those of defendant." *Parker*, 472 A.2d at 1210. Similarly, in this case, the fact that the Department of Health did not conduct any DNA, hair or fiber analysis is not probative of any material or relevant matter because Martinez offered no evidence that such testimony would have resulted in exculpatory or impeaching evidence. If, as Martinez asserts in his brief, he "possessed solid evidence that the complainant indeed had engaged in sexual activity which could have accounted for the evidence of spermatozoa," there is no evidence in the record that he made such an offer of proof. Thus, the trial justice properly excluded speculative testimony about whether an unperformed DNA test may or may not have excluded Martinez.

**3. The Presentence Report**

 It was determined at the sentencing hearing that the presentence report contained some inaccuracies. Defense

counsel moved for a continuance to allow Martinez to prepare a new presentence report with the assistance of a qualified Spanish interpreter. The trial justice offered defense counsel the opportunity to correct the errors in open court. He declined the offer, moving instead to strike the report. The motion was denied for lack of specificity. Thereafter, the trial justice declared that he was not going to use the report in his deliberations; rather, he was:

> "going to base [the sentence] on the recommendation of both the prosecution and the Defendant's attorney and also base it on what I heard from the victim and what I've heard from the Defendant this morning."

Martinez contends that the trial justice erred in denying him the opportunity to correct the report and that he compounded that error when he disregarded the report altogether. As a result of these alleged errors, Martinez contends that the trial justice imposed his sentence in an illegal manner. It is our opinion that this issue is not properly before the Court.

We have declared repeatedly that:

> "in the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct appeal. * * * Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. * * * In the event that a defen-

dant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal." *State v. Girard,* 799 A.2d 238, 253 (R.I. 2002) (quoting *State v. Bettencourt,* 723 A.2d 1101, 1114 (R.I.1999)).

The record reveals that Martinez did not file a Rule 35 motion to correct his sentence[4] nor even has he alleged that this issue constitutes such an extraordinary circumstance justifying our review on direct appeal.

■ Our review of the record reveals that the issue does not amount to an extraordinary circumstance. Accordingly, "the absence of a determination made pursuant to a Rule 35 motion precludes this Court's consideration of the defendant's challenge to his sentence." *Girard,* 799 A.2d at 254 (quoting *Bettencourt,* 723 A.2d at 1114). Consequently, "[t]he statutory 120–day period in which to seek Superior Court review of the sentence commences on the date of this opinion should the defendant choose to file such a motion; therefore, the defendant's appeal on this issue is denied and dismissed without prejudice." *Bettencourt,* 723 A.2d at 1114.

Nevertheless, even overlooking this procedural difficulty, review of the record further reveals that the trial justice did what he could to correct any inaccuracies in open court, and that he received no cooperation from the defense in the process. However, these alleged inaccuracies do not appear to be critical to the sentencing

---

4. Rule 35(a) of the Superior Court Rules of Criminal Procedure provides in pertinent part:

> "The court may correct an illegal sentence at any time. The court may correct a sentence imposed in an illegal manner and it may reduce any sentence when a motion is filed within one hundred and twenty (120) days after the sentence is imposed, or within one hundred and twenty (120) days after

receipt by the court of a mandate of the Supreme Court of Rhode Island issued upon affirmance of the judgment or dismissal of the appeal, or within one hundred and twenty (120) days after receipt by the court of a mandate or order of the Supreme Court of the United States issued upon affirmance of the judgment, dismissal of the appeal, or denial of a writ of certiorari."

process. Under all the circumstances, we believe that the trial justice made the correct call in not relying upon the presentence report before passing sentence upon this defendant.

For the foregoing reasons, the appeal is denied and dismissed. The judgment of conviction is affirmed and the papers are remanded to the Superior Court. Martinez's appeal from his sentence is denied without prejudice.