STATE OF LOUISIANA

VERSUS

TORY N. CLARK

NO. 20-KA-167

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 10-4853, DIVISION "A"
HONORABLE RAYMOND S. STEIB, JR., JUDGE PRESIDING

November 18, 2020

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Stephen J. Windhorst

<u>**CONVICTION AFFIRMED; SENTENCE AMENDED; CASE**</u>
<u>**REMANDED FOR CORRECTION OF THE UCO**</u>
     **SMC**
     **SJW**

<u>**DISSENTS, IN PART, WITH REASONS**</u>
     **MEJ**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Gail D. Schlosser
     Thomas J. Butler
     Matthew R. Clauss
     Shannon K. Swaim

COUNSEL FOR DEFENDANT/APPELLANT,
TORY N. CLARK
     Bruce G. Whittaker

**CHEHARDY, C.J.**

Defendant, Tory Clark, appeals his conviction for second degree murder of Terrance Augustine. This is defendant's third appeal after the first two appeals were dismissed for procedural infirmities. For the reasons that follow, we affirm defendant's conviction but modify his sentence to comply with La. R.S. 15:574.4, as amended, which reduced the time a juvenile must serve before reaching parole eligibility from 35 to 25 years. Defendant is sentenced to life imprisonment at hard labor without the possibility of probation or suspension of sentence, but defendant may become eligible for parole after serving 25 years. This matter is remanded to the trial court and the Clerk is directed to amend the sentencing minute entry and the Louisiana Uniform Commitment Order (UCO) to reflect the sentence as amended, and to transmit the amended UCO to the appropriate authorities.

## PROCEDURAL HISTORY

On September 30, 2010, a Jefferson Parish Grand Jury indicted defendant, Tory N. Clark, for second degree murder of Terrance Augustine in violation of La. R.S. 14:30.1. Clark was only fifteen years old at that time. He was arraigned and pled not guilty. The case was tried from January 27 through January 30, 2015, before a twelve-person jury that unanimously found Clark guilty as charged.

On February 11, 2015, defendant filed a motion for post-verdict judgment of acquittal and a motion for appeal. The motion for appeal was granted the next day, February 12, 2015. On April 2, 2015, defendant filed a motion for new trial; that same day, the trial court denied defendant's motion for post-verdict judgment of acquittal and motion for new trial, and held a sentencing hearing pursuant to La. C.Cr.P. art. 878.1. On April 14, 2015, the trial judge sentenced defendant to life imprisonment with eligibility for parole after thirty-five years.

Because the trial court had granted defendant's motion for appeal before ruling on defendant's post-verdict motions and before imposing defendant's sentence, the trial court had been divested of jurisdiction to sentence defendant or to rule on his post-verdict motions. Accordingly, on defendant's first appeal, this Court vacated the sentence, remanded for a ruling on post-verdict motions, and, if those motions were denied, for resentencing, after which time defendant could appeal his conviction and sentence. *State v. Clark*, 15-357 (La. App. 5 Cir. 11/19/15), 180 So.3d 602, 604.

On February 29, 2016, on remand, the trial court denied defendant's motions for post-verdict judgment of acquittal and new trial. On the same date, the trial court sentenced defendant to life imprisonment with eligibility for parole after serving thirty-five years.[1] On June 12, 2018, defense counsel filed a Motion for Out of Time Appeal, which the trial court granted on June 14, 2018.

In his second appeal, this Court found defendant's request for an out-of-time appeal was untimely and dismissed the appeal. *State v. Clark*, 18-519 (La. App. 5 Cir. 12/27/18), 263 So.3d 957, 958. Defendant thereafter filed a writ application in the Louisiana Supreme Court, which granted the writ and remanded the case to this Court for consideration on the merits. The Supreme Court determined that defendant's trial counsel failed to file a second motion for appeal after remand for defendant's sentencing, thus, defendant lost his constitutional right to an appeal through no fault of his own. *See State v. Clark*, 19-1077 (La. 5/1/20), 295 So.3d 935, 936-37.

## FACTS

This case arises from flaring tempers and false bravado exhibited by young men at a block party in Kenner that ended in the shooting death of an innocent

---

[1] The hearing transcript indicates the trial court did not impose the sentence with hard labor, as required by La. R.S. 14:30.1. This patent error is discussed below.

bystander. Testimony and evidence elicited at trial depicts an initial altercation between Jade Berry and Dorion Johnson; Berry then told her friend Danny Bell about the altercation. Bell was attending the block party with defendant and other friends; tension escalated between Bell's group and Johnson's group; and defendant and at least one other person in Bell's group followed Johnson's group when Johnson's group left the party. Defendant testified at trial that he followed Johnson's group; he quickly retrieved a weapon that had been stashed nearby, and he fired four shots in the direction of Johnson's group, though he contends he did so in self-defense. A 12-person jury unanimously convicted him of second-degree murder after hearing testimony from several witnesses for the State and the defense, apparently rejecting defendant's self-defense claim. At trial, the jury heard the following testimony:

Detective David Schlueter of the Kenner Police Department testified that on the night of June 26, 2010, his patrol unit was parked on the corner of 27th Street and Greenwood Street in Kenner, where he was monitoring a large block party. Detective Schlueter responded to an unrelated disturbance a few blocks away, but while there, he heard six or seven gunshots in rapid succession coming from the Greenwood area. As Detective Schlueter drove down 27th Street toward Greenwood, he saw people running in different directions. When Detective Schlueter approached the corner of 27th and Fayette Street, west of Greenwood, he was flagged down by people who pointed to a subject, later identified as Terrance Augustine, lying on the ground in a driveway.[2] EMS took the victim to University Hospital where he later died.

---

[2] Demonstrative exhibits introduced at trial show that Greenwood street runs north and south and crosses 27th Street, which runs east and west. Fayette Street runs north and south, crosses 27th Street, and is west of Greenwood. Salem Street also runs north and south, crosses 27th Street, and is west of Fayette and Greenwood. The block party was located on Greenwood, north of 27th Street.

Dr. Karen Ross, an expert in the field of forensic pathology, performed an autopsy on the victim. The cause of death was a gunshot wound to the back of the head; the manner of death was homicide. Dr. Ross recovered a 9-millimeter projectile from the frontal region of the victim's head. She testified that the projectile entered the back of the victim's head sideways. When she retrieved the bullet, it appeared that one side of it had been scraped off, consistent with the bullet having ricocheted after striking some other object before hitting the victim.

Detective Joseph McRae of the Kenner Police Department was the primary case officer investigating the murder. He brought defendant in for questioning along with his mother.[3] After waiving his rights, defendant gave a recorded statement to Detective McRae indicating that he was at a party near Greenwood and 27th Streets with Charles Lathers and with his cousins, Cory Cage and Danny Bell. Cage and Bell approached Latyres "Tyrus" Turley and Dorion "DoDo" Johnson anticipating a fight. Defendant stated that Tyrus and DoDo walked down the street and that he (defendant), Cage, and Bell walked behind them but then stopped at the corner. Defendant stated that Tyrus, Dodo, "Keevin,"[4] and "Gauge," then started running away toward the intersection of Fayette and 27th Streets. Defendant claimed in his statement that he heard a gunshot from Fayette and saw "Keevin" pull out a revolver and shoot at him. Defendant said he then pulled a .380 gun from his waist area and shot back four times. Defendant said he also heard gunshots next to him but claimed he did not know who was shooting. Defendant claimed he was the only one with a gun among him, Bell, and Lathers; he also stated that he usually kept the gun hidden behind an abandoned house on Helena. According to defendant's statement, after the shooting, he and Lathers ran to Helena where defendant threw the gun into a field.

---

[3] Detective McRae reviewed the juvenile advice of rights form with defendant, and defendant's mother signed as a witness.

[4] The record also spells Keevin as "Keeven."

Detective McRae arrested defendant for second-degree murder and returned to defendant's mother the rosary bead necklace he had been wearing.[5] Detective McRae obtained search warrants for the homes of defendant and Lathers.[6] Detective McRae indicated that Thomas Houston had positively identified Lathers as one of the shooters. Detective McRae also discovered that an online profile of Lathers included a picture of Lathers and defendant in which defendant was wearing a brownish military-style hat and a rosary necklace. While searching defendant's bedroom, Detective McRae found a 9-mm magazine containing six live 9-mm rounds and one live .223 Remington round. He also found a tan or brownish military-style hat with a neck string in the laundry room of defendant's house.

Mary Beyer, a Kenner Police Department crime scene technician, collected three .380 casings and eight 9-mm casings from the corner of 27th and Greenwood. She also collected three projectiles: one from Fayette Street near the intersection of 27th, one from 233 27th Street, and one from 2703 Salem Street. A jacketed projectile also was collected from 2713 Salem. Ms. Beyer documented that a vehicle located on the corner of 27th and Salem had damage to its windows, apparently caused by the shooting.

Colonel Timothy Scanlan, an expert in the field of firearms and toolmark examination, examined the casings and projectiles recovered. He explained that the three .380 casings recovered were fired from the same weapon and that all eight 9-mm casings recovered were fired from another single weapon. Colonel Scanlan

---

[5] Detective McRae subsequently learned that one of the shooters was wearing a rosary-style necklace and that one of the shooters was wearing a brown army-style hat.

[6] In the master bedroom at Lathers' home, Detective McRae also located a live 9-mm Luger round. In another room of defendant's home, Detective McRae located two large capacity magazines and two 7.62 by 39-caliber bullets. He searched a vehicle in the driveway and found a 9-mm handgun. Detective McRae stated that the magazine of that 9-mm weapon contained eight live 9-mm Luger rounds. Ultimately this 9-mm handgun and the large capacity magazines and other ammunition were not traced to the scene of the shooting at issue here.

found that two of the projectiles were consistent with 9-mm ammunition and another projectile was consistent with .32-caliber ammunition.

Colonel Scanlan also examined a .380 handgun that Joseph Humbles, the victim's cousin, located in a vacant lot on the corner of Helena and 27th Streets.[7] Colonel Scanlan admitted that the .380 casings found at the scene were not fired from the weapon that Mr. Humbles found; he also noted that a .32 auto cartridge was wedged in the barrel of the weapon that Mr. Humbles found. Colonel Scanlan further testified that there was a ".380 caliber cartridge" in the barrel and some ammunition in the magazine. He determined that the .380 weapon was able to fire a .32-caliber projectile but he could not say whether the .32 projectile found at the scene was fired from that weapon. Colonel Scanlan further stated that the casings found close together at the scene were consistent with stationary shooters and at least two guns being used.

In addition to the testimony from Kenner Police and the coroner, several fact witnesses testified about the events surrounding the shooting: Patrick Augustine, Lorenzo Augustine, Thomas Houston, Latyres "Tyrus" Turley, Dorion "DoDo" Johnson, Danny "D.L." Bell, Corey Cage, Jade Berry, Cory Wilson, Brennan Bellard, Keeven Robinson, and defendant. Although their testimony was largely consistent regarding events that occurred at the block party before the shooting, the testimony widely diverged with regard to who shot first, how many shooters there were, who possessed weapons, and what kind of weapons were involved.

The witnesses consistently agreed that DoDo Johnson and Jade Berry had an altercation earlier that evening, that Berry told Bell about the altercation, and that members of the group associated with Berry (Bell, defendant, Lathers, and Cage)

---

[7] The .380 that Mr. Humbles found was not examined for fingerprints because it had been exposed to the weather for some time and because Mr. Humbles had handled it before turning it over to the Kenner Police.

indicated they wanted to fight the group associated with Johnson (Turley, Johnson, and Houston).

Patrick Augustine and Lorenzo Augustine were not associated with either defendant's group or Johnson's group. Patrick Augustine testified for the State that he, Lorenzo (his brother), and Terrance Augustine (his cousin, the victim) left Patrick's mother's house at 215 27th Street, intending to attend the block party. They walked down 27th and reached Fayette. Before reaching the party, however, they saw people running back toward Fayette from Greenwood. Soon thereafter, Patrick heard shots coming from the area of Greenwood and 27th but he did not hear gunshots coming from the area of Fayette and 27th. He stated the gunshots occurred in rapid succession. Lorenzo Augustine's testimony largely corroborated that of his brother, Patrick.

Thomas Houston testified for the State that on June 26, 2010, he went to the block party where he met his cousin, Latyres Turley. Houston overheard people at the party speaking about Turley. He became concerned for Turley's safety, so he told Turley they should go, but Turley did not want to leave. Houston returned to the area where people were talking about Turley. It appeared that some people in that group were carrying guns – one wearing rosary beads and another wearing a brownish army hat with a string tied in front. According to Houston, as he and Turley were leaving, someone in the other group yelled at Turley asking if he wanted to fight. Houston and Turley began walking away from the party and later started running toward Fayette, with Turley a little bit ahead of him. Houston was on 27th Street, about halfway between Greenwood and Fayette, when he saw two people pull out guns and start shooting in Turley's direction, toward Fayette Street. Houston said the shooters were standing at the corner of 27th and Greenwood and, after shooting, they ran in the other direction. He did not hear any gunshots before he heard the shots coming from the Greenwood area. After giving a statement to

the police, Houston positively identified Lathers as one of the shooters in a photographic lineup; however, at trial, Houston testified that Lathers was one of the people at the party but not a shooter. Houston admitted at trial that after identifying Lathers as a shooter in the photographic lineup, Houston was contacted by a defense attorney; that attorney spoke to him about the case and prepared an affidavit stating that Lathers was *not* one of the shooters, which Houston signed.[8]

Mr. Turley testified for the State that on the night in question he "hung out" with Johnson and spoke with his cousin, Houston, at the block party. Houston was concerned that another group would start a fight with Turley, based on comments Houston had overheard. Turley eventually left and as he was leaving, Cage approached Turley and said he wanted to fight. Defendant and Lathers were with Cage. Turley, Johnson, and Houston walked south on Greenwood, then west on 27th, after which Turley started running. As he was running away, Turley heard gunshots coming from 27th and Greenwood. Turley did not hear any gunshots coming from 27th and Fayette nor did he see anybody shooting at the intersection of 27th and Fayette. Turley testified that he did not shoot anybody that night nor did he have a gun that night.

Mr. Johnson's testimony corroborated Mr. Turley's testimony. Mr. Johnson did not hear any gunshots coming from 27th and Fayette nor did he see anyone shooting from there. Afterward, Johnson ran farther down 27th toward Salem where he entered a back yard and then went to his cousin's house. Johnson testified it was Bell and Cage who wanted to fight him.

Mr. Bell testified for the State that while at the block party with defendant (his cousin), Lathers, and Cage, Berry told him about her altercation with Johnson. At trial, Bell denied telling the police that he asked Turley's group if they wanted

---

[8] At no point – either in his statement to police or at trial – did Houston identify Tory Clark as a shooter. Houston also testified that a lot of people at the party were wearing rosary beads as a necklace, not just defendant.

to fight, although his earlier statement to police reflected as much. Bell testified that shortly after defendant and Lathers followed Turley's group, Bell heard gunshots. At trial, Bell testified that he did not remember where the gunshots came from; however, his statement to the police indicated that he heard gunshots from 27th and Greenwood and ran home. Bell denied that defendant had shot anybody.

Mr. Cage, another of defendant's cousins, testified for the State that he could not recall being at a block party on the night of June 26, 2010. Although he gave a statement to the police about it soon after the incident, he claimed not to recall many details at trial. Ultimately, Bell admitted to being at the scene that night and running when he heard the gunshots but claimed not to remember any other details.

Ms. Berry testified for the defense that after her altercation with Johnson, she told Bell about the altercation, who told Cage. Bell and Cage wanted to fight Johnson. Berry later heard gunshots on Greenwood but she did not see anyone with weapons that day and did not see who was shooting. She recalled seeing Turley, [Keeven] Robinson, and Johnson, and she agreed that defendant and Lathers were in the same group as Cage and Bell that night.

Mr. Wilson, defendant's cousin, testified for the defense that he attended the block party and saw defendant, Cage, Lathers, and Bell there but did not talk to them. Approximately ten to fifteen minutes after he arrived, he heard gunshots and ran the opposite way toward Aberdeen. Wilson testified that he saw Turley and Robinson shooting guns but he did not see defendant shoot, and it looked like defendant's gun had jammed. Wilson claimed he heard gunshots coming from multiple directions. He admitted that he never gave a statement to the police after the incident and that an attorney had contacted him about the case only two days before trial.

Mr. Bellard testified for the defense that he and defendant were together at the party and that Lathers, Cage, Turley, Robinson (his cousin), Davonte Ivey, and

"Montario" were there as well. He recalled that Turley approached them and was talking "crazy" and cursing; "words" were passed back and forth. Bellard claimed that Turley flashed a weapon and that Turley and Robinson walked past them saying "things." Turley's group walked on to 27th toward Fayette.

Bellard testified that while he was at his grandmother's house on the corner of 27th and Greenwood, he heard approximately six gunshots and saw either Robinson or Turley shooting at defendant's group. Bellard testified that defendant's gun did not shoot because it jammed. He also testified that he heard Ivey shooting and that Ivey was the only person he saw shooting. Bellard said he saw flashes of light coming from where Lathers and Ivey were standing and from where Turley and Robinson were located. Bellard admitted he had a gun that night. He testified that after the confrontation between his group and the other group, defendant retrieved his gun from the alleyway, where defendant kept the weapon in case he needed it.

Mr. Keeven Robinson testified for the defense that he was at the block party but was not "hanging" with anybody that night; he was sitting in the back of his grandmother's truck in front of her house on Greenwood. He ran inside when he heard gunshots. Robinson testified that he was not with Turley, that he did not walk down Greenwood or 27th, and that he did not have a gun that night. He further testified that he did not see Turley that night and never saw Turley or anyone else out there with a gun.

Finally, defendant testified that he and Lathers went to the block party. Berry approached Bell to tell him about the altercation with Johnson. Bell then told Cage about the altercation. Bell and Cage then approached Johnson and asked, "What's up?" like they wanted to fight, and the "other party" responded "What's up?" The "other party" walked down the street and then defendant's group started walking down the street. Defendant retrieved the gun he had found two months

earlier and put the gun "on [his] waist" in case "things got out of hand" because he knew the "other party" possessed weapons. Defendant and his group then walked to the street corner. He testified that when he first heard gunshots, he was in the middle of 27th Street; somebody was shooting at him from the corner of Fayette. Defendant stated that he originally thought it was Robinson, as he indicated in his statement, but at trial he claimed he did not know who it was because they were packed in a group.

Defendant testified that he shot in the direction of Fayette approximately three or four times and then his gun jammed. This was the first time he had ever shot a gun. Afterward, he and Lathers ran to the other side of the neighborhood. Defendant called a friend who came to pick them up. Later, defendant's stepfather took him to the police station where his mother met him. She told him to tell the truth and if there was anything he knew, he should tell the police, which he did.

Defendant testified that the victim, Terrance Augustine, was his friend and he did not want to harm him. He claimed that he was scared for his life that night because there had been an altercation, and he never intended to shoot his gun that night or to kill somebody. He further claimed that everything seemed "blurry" and that his adrenaline was "pumping." Defendant stated that each time he pulled the trigger, he was not sure what the gun did because he had his head turned. He said he was just shooting the gun "to scare them" because he thought "they were trying to do him something." After the shooting, defendant threw the gun in the field on Helena. Defendant acknowledged that he knew guns could kill people and that shooting a gun could end in someone's death. Defendant testified that his mother told the truth when she testified that he told her he had shot a .380.

During deliberations, the jury asked the trial court to again provide definitions for second-degree murder, negligent homicide, and manslaughter. The court called the jury back and re-read the definitions. The jury convicted defendant

of second-degree murder. The jury poll established that the verdict was unanimous. Defendant now asserts two assignments of error on appeal.

## DISCUSSION

*Sufficiency of the Evidence*

Defendant's second assignment of error suggests the evidence was insufficient to support the verdict because the State failed to prove beyond a reasonable doubt that the killing was not committed in self-defense. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first address the sufficiency assignment of error by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. *Id.* Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. *Id.* We accordingly address defendant's second assignment of error regarding sufficiency of evidence first. *See also State v. Nguyen*, 05-569 (La. App. 5 Cir. 2/3/06), 924 So.2d 258, 262.

Defendant contends the facts elicited at trial show that when he was confronted by others at the party, one or more of whom he believed to be armed (Robinson and Turley), his response to that perceived threat, though perhaps ill-advised when judged in hindsight, was not so unreasonable as to support the guilty verdict when considered in the context of the scene at the block party where youthful emotions were running high. Defendant asserts that he responded with deadly force only because he believed he had no other choice to save his own life. He also asserts that the evidence shows he caused no physical harm to anyone, and

neither he nor Lathers had a specific intent to kill anyone.

In response, the State contends the jury could rationally disbelieve defendant's claim of self-defense in light of the evidence presented. The State notes that five eyewitnesses testified that gunshots came from defendant's location, but no gunshots were fired from any other location. This testimony was consistent with the testimony of Detective Schlueter, who heard a single, uninterrupted burst of gunfire, as opposed to a volley of fire followed by return fire. The State also argues defendant cannot claim self-defense under Louisiana's aggressor doctrine because the evidence shows the intended victims were walking away from the fight, but defendant went out of his way to retrieve a weapon, follow them, and shoot at them.

When reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

In cases involving circumstantial evidence, the trial court must instruct the jury that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether defendant's suggested hypothesis of innocence offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d

78, 83; *State v. Washington*, 03-1135 (La. App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender: 1) has the specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. *See State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. In addition to proving the elements of an offense, the State must prove the identity of the defendant as the perpetrator. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500, *writ denied*, 15-0685 (La. 2/26/16), 186 So.3d 468. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *Id*.

Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime. *State v. King*, 06-554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07-371 (La. 5/4/07), 956 So.2d 600. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. *Id*.

A person may be convicted as a principal to second degree murder even if he has not personally fired the fatal shot. *State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 449-50, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299. The law of principals states that all persons involved in the commission of a crime are equally culpable. *See State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91

So.3d 453, 463-64, *writ denied*, 12-991 (La. 9/21/12), 98 So.3d 332 ("Whether the defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime.").

The doctrine of transferred intent provides:

> When a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim.

*State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566-67, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.

The jury instructions indicate the State tried defendant under the first theory of second-degree murder, requiring the State to prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific intent is a question of fact. *State v. Durand*, 07-4 (La. App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, *writ denied*, 07-1545 (La. 1/25/08), 973 So.2d 753.

Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, 585, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); *see also State v. Batiste*, 06-869 (La. App. 5 Cir. 4/11/07), 958 So.2d 24, 27. Specific intent to kill may be inferred from the extent and severity of the victim's injuries. *State v. Stacker*, 02-768 (La. App. 5 Cir. 12/30/02), 836 So.2d 601, 606, *writ denied*, 03-411 (La. 10/10/03), 855 So.2d 327. A defendant may be convicted as a principal to second degree murder even if he did not personally fire the fatal shot. *Page*, 28

So.3d at 50. A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183 (La. App. 5 Cir. 10/31/00), 772 So.2d 854, 860, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151.

Defendant admits he pulled the trigger four times, in the direction of the opposing group, but contends he shot his firearm in self-defense. When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Reed*, 11-507 (La. App. 5 Cir. 2/14/12), 88 So.3d 601, 607, *writ denied*, 12-644 (La. 9/14/12), 97 So.3d 1014. The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18.

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1).

"A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21. Although "there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger." *State v. King*, 11-767 (La. App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, *writ denied*, 12-660 (La. 9/14/12), 99 So.3d 35.

The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to

prevent the danger. *State v. Sinceno*, 12-118 (La. App. 5 Cir. 7/31/12), 99 So.3d 712, 720, *writ denied*, 12-2024 (La. 1/25/13), 105 So.3d 713. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt.

Based on the testimony and evidence at trial, the evidence was sufficient to establish that defendant was a principal to the second-degree murder of Terrance Augustine. Defendant's statement to the police and his own testimony at trial established that he and Lathers followed Johnson and Turley, who were leaving the block party after people in defendant's group challenged people in Johnson's group in response to an altercation that occurred between Berry and Johnson. Defendant testified that he retrieved a weapon that he kept stashed away before following Johnson's group. Defendant also testified that he fired shots when he was near the area of Greenwood and 27th Streets, that he and Lathers fled the scene, and that he threw his gun in a field on Helena.

The jury also heard evidence indicating that Lathers was the other shooter. The recovery of .380 casings and 9-mm casings at the scene established that there were at least two guns involved in the incident, and defendant admitted on cross examination that he did not shoot two guns. Detective McRae testified that Thomas Houston identified Lathers as one of the shooters when he was shown a photographic lineup not long after the incident. Although at trial Houston denied Lathers was a shooter, and defendant refused to name the other shooter, the jury could have accepted Houston's initial identification as true to conclude that both Lathers and defendant shot at the opposing group and, even though defendant's weapon did not fire the fatal shot, defendant was a principal to the crime. "Whether the defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime." *Massey*, 91 So.3d at 463-64. *See also Page*, 28 So.3d at 449-50; La. R.S. 14:24.

The jury reasonably could conclude that defendant had the specific intent to kill or to inflict great bodily harm and that the State met its burden of proving second degree murder beyond a reasonable doubt. Defendant admits to pointing his .380 weapon in the direction of Johnson and his group and pulling the trigger three or four times. Witnesses for both defendant and the State testified that persons near the corner of 27th and Greenwood Streets discharged firearms in the direction of Fayette. The jury heard testimony that the shooters wore a rosary necklace and a brown army-style hat with a string. Detective McRae testified that he found a brown hat with a string in the laundry room at defendant's home and that defendant had given his mother his rosary necklace at the time of his arrest.

Defendant also claimed he shot a .380 weapon. Although the victim was killed by a 9-mm projectile, not a .380 projectile, the jury could reasonably conclude that the State met its burden of proof beyond a reasonable doubt that defendant was a principal to second degree murder; that he had specific intent to kill or inflict great bodily harm on Turley, Johnson, or other members of their group; and that this intent transferred to the victim. *See* La. R.S. 14:10(1); *Baham*, 169 So.3d at 566-67.

Further, the jury reasonably could have concluded that, in light of the testimony and evidence presented at trial, the State met its burden of proving beyond a reasonable doubt that defendant was not acting in self-defense. The intended victims were *walking away* from a potential fight when defendant retrieved his weapon, followed, and shot at them, behaving more as an aggressor than as the victim of another party's aggression. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary

knows or should know that he desires to withdraw and discontinue the conflict."
La. R.S. 14:21.

The evidence was also sufficient for the jury to determine that shots were not fired at defendant first. Patrick Augustine, Lorenzo Augustine, Houston, Turley, and Johnson all testified that all of the gunshots fired that evening came from the intersection of 27th and Greenwood, where defendant admits he was standing at the time he pulled the trigger.[9] Further, Detective Schlueter testified that he heard six or seven gunshots in rapid succession, as opposed to one or more gunshots followed by a second set of gunshots constituting return fire, as defendant claims.

The identity of the person or persons who allegedly shot at defendant was also never conclusively determined.[10] In his statement to the police, defendant claimed that Robinson was shooting at him with a revolver; at trial, however, defendant testified that he did not know who was shooting at him.

The jury heard the conflicting testimony and apparently credited the version of events portrayed by the witnesses who testified that shots came only from 27th and Greenwood rather than the witnesses who testified shots were exchanged between groups. Adjudging the credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

---

[9] Defendant testified at trial that while he and his group were standing at 27th and Greenwood, somebody shot at him first from the corner of 27th and Fayette. Defendant also asserted at one point that he fired shots only to scare the other group. He stated that he thought he shot the gun four times but that the gun jammed.

[10] Corey Wilson, who never gave a statement to the police after the incident, testified that he saw Turley and Robinson shooting guns, that he did not see defendant shoot, and that it looked like defendant's gun jammed. Brennan Bellard also testified that he saw either Turley or Robinson shooting and that defendant's gun did not shoot because it jammed. Both Mr. Wilson and Mr. Bellard conceded on cross examination that they would do whatever they could to help out their cousin, the defendant. The jury evidently did not accept Mr. Wilson's and Mr. Bellard's version of events surrounding the shooting.

Applying the *Jackson* standard and viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient for the jury reasonably to reject defendant's alternative hypothesis that he was acting in self-defense and to conclude defendant was guilty of second-degree murder. There is no merit to defendant's second assignment of error regarding sufficiency of evidence.

*Shooting Demonstration during Defendant's Trial Testimony*

During cross-examination, defendant testified that he was not sure if his gun shot, that he was scared for his life, that everything seemed "blurry," and that his adrenaline was "pumping." Afterward, the prosecutor asked defendant to stand up, take the gun, hold it the way he held it on the day of the incident, and to shoot the gun toward the door the way he shot it down the street that day. Defense counsel objected, stating that it was inflammatory and completely unnecessary. The trial court determined that the prosecution had a right to point out the differences between defendant's testimony at trial in 2015 and his statement given a few days after the accident in 2010, and allowed the demonstration to proceed.

The prosecutor then counted four times and asked defendant if he shot it like that, to which defendant answered affirmatively. During the demonstration, defendant said he was not sure what the gun did each time he shot it because he had his head turned. He said he was just shooting the gun to scare them because he thought "they were trying to do [him] something." Defendant said he was not one hundred percent sure if the gun was shooting or not, but he stopped shooting after four times because he felt "as if it was time for [him] to go" and four shots were enough to scare them off. Defendant was unsure who shot at him.

Defendant's first assignment of error contends the trial judge should not have permitted the State to require him to stand before the jury with the .380 weapon introduced in evidence and to pull the trigger four times. He argues the demonstration was irrelevant, without probative value, and completely prejudicial.

The State argues the trial court correctly determined the demonstration was relevant. According to the State, the prosecutor's request helped the jury determine the truth of defendant's self-defense claim by asking him to show the jury what he said he did at the time of the shooting. Before the demonstration, defendant said he shot four times, that he was acting in self-defense, and that he stopped shooting because his gun jammed. After the demonstration, however, defendant testified that he was not sure if he was shooting and that he had stopped shooting because "it was time for me to go" and that four shots were enough to "scare them off."

The State further contends that defendant fails to show how he was prejudiced by the demonstration, because on direct examination defendant already had admitted to firing a .380 weapon. The State argues that defendant chose to testify at trial, subjecting himself to cross-examination. Although defendant's credibility may have been damaged as a result of the demonstration, that damage resulted from the inconsistencies between his testimony at trial and his prior statements to the police, not because he held the gun at trial.[11]

Relevant evidence is defined in La. C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402. Although evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.

---

[11] Detective McRae testified at trial that in defendant's June 29, 2010 statement, defendant said Robinson pulled out a revolver and shot at him, after which defendant shot back four times with a .380. At trial, however, defendant testified during direct examination that he shot his gun because an unknown person was shooting at him from the corner of Fayette and 27th. He explained that he attempted to "pull up" his gun, and he thought he shot approximately four times, but the gun jammed.

Under Louisiana's Code of Evidence "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." La. C.E. art. 611(B). Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness. *State v. Honore*, 09-313 (La. App. 5 Cir. 1/12/10), 31 So.3d 485, 501 (citing *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So.2d 583, 616, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007)). The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court's broad discretion. *Id.*

It is well settled that the requirement of exhibiting identifying characteristics is demonstrative rather than testimonial evidence and does not violate the Fifth Amendment right against compulsory self-incrimination. *State v. Guidry*, 12-296 (La. App. 5 Cir. 12/11/12), 106 So.3d 1062, 1066, *writ denied*, 13-76 (La. 6/14/13), 118 So.3d 1080. The use of demonstrative evidence is within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Hutchinson*, 02-60 (La. App. 5 Cir. 5/15/02), 817 So.2d 500, 507.[12]

Although we have not found a Louisiana case directly on point, courts in other jurisdictions have found similar demonstrations permissible. For example, in *State v. Gil*, 543 A.2d 1296 (R.I. 1988), the State asked defendant during cross-examination to step down from the witness stand, show how he held the gun when

---

[12] Louisiana courts have allowed the State to compel a criminal defendant to exhibit his physical features without finding an infringement of his privilege against self-incrimination. Louisiana courts have compelled a defendant to put on a shirt, to allow his height to be measured, and to exhibit a scar, a bruise, and a tattoo. Defendants in Louisiana have been forced to stand and identify themselves, to give blood samples and handwriting samples, to demonstrate the manner in which they open cigarette packs, and to say the words used by the robber who committed the crime. *Hutchinson*, 817 So.2d at 506-07.

he fired the shots, and demonstrate how the shooting occurred. Defendant responded that he did not remember how he had grabbed the gun or how he held it. Over defense counsel's objection, the trial court found the demonstration was permissible cross-examination intended to refresh defendant's recollection of the incident. Because defendant's theory at trial was that he feared for his life and acted in self-defense, the sequence of events surrounding the shooting was extremely important. The appellate court found the demonstration appropriate, noting that defendant was asked to demonstrate actions he had previously described to police but could not remember on direct examination, and defendant's testimony on direct examination contradicted the statement he gave to police on the day of the shooting. As such, the entire demonstration was relevant to the issue of the defendant's credibility and was within the scope of permissible cross-examination. 543 A.2d at 1299-1300.

Likewise, in *Price v. State*, 82 Md. App. 210, 570 A.2d 887 (Md. 1990), *writ denied*, 320 Md. 16, 575 A.2d 742 (1990), defendant was convicted of two counts of second-degree murder. On appeal, defendant argued the trial judge erred in overruling his objection and ordering him to hold the gun as he did during the shooting. Defendant claimed the demonstration was unnecessary because he already had testified how he held the gun; therefore, unfair prejudice resulted. The appellate court noted that a trial judge is vested with wide discretion in permitting or denying demonstrations; it found defendant's ability to remember exactly how he held the rifle was probative of the possible inference that he was capable of recalling in detail the circumstances of the shootings. The appellate court concluded the trial judge did not abuse its discretion in ordering defendant to demonstrate how he held the rifle. 82 Md. App. at 223-24.

Here, defendant's trial testimony regarding the shooting differed somewhat from the statement he gave to Detective McRae. In his earlier statement, defendant

said Robinson shot at him; at trial, he testified that he was not sure who shot at him. In his statement, defendant did not say anything about his gun jamming or about not being sure if his gun shot, unlike his testimony at trial.

We find the trial court did not abuse its discretion in permitting the demonstration under these circumstances. Defendant chose to take the stand in his own defense, thereby subjecting himself to reasonable cross examination, including questions as to what occurred at the time of the shooting. Additionally, because defendant claims to have feared for his life and acted in self-defense when he shot the gun four times, the sequence of events surrounding the shooting was important and relevant to a determination of defendant's credibility. *See Gil*, *supra*. Defendant's first assignment of error lacks merit.

*Errors Patent*

We reviewed the record for errors patent in this matter pursuant to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337, 338-39 (La. 1975); and *State v. Weiland*, 556 So.2d 175, 178 (La. App. 5 Cir. 1990), and found three, discussed herein.

(i)     Sentence – Hard Labor

Defendant's commitment sheet indicates his sentence was imposed at hard labor, yet the hearing transcript does not reflect that the trial court imposed the sentence "at hard labor" or that his sentence would be served with the Department of Corrections. Generally, where there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

La. C.Cr.P. art. 879 requires a court to impose a determinate sentence. If the applicable sentencing statute allows discretion, the failure to indicate whether the sentence is to be served at hard labor is an impermissible indeterminate sentence. *State v. Norman*, 05-794 (La. App. 5 Cir. 3/14/06), 926 So.2d 657, 661, *writ*

*denied*, 06-1366 (La.1/12/07), 948 So.2d 145. Defendant was sentenced pursuant to La. R.S. 14:30.1, which requires the sentence to be served at hard labor, leaving the trial court no discretion on this component of defendant's sentence. Thus, although the trial court's failure to include the language that the sentence was to be served at hard labor is error, we find it is harmless error and corrective action is not required. *Id.*; *see also State v. Dennis*, 12-818 (La. App. 5 Cir. 5/16/13), 118 So.3d 1166, 1174, *writ denied*, 13-1384 (La. 12/6/13), 129 So.3d 530.

   (ii)    Sentence – Statutory Restrictions

According to the sentencing hearing transcript and the sentencing minute entry, the trial court sentenced defendant to life in prison with eligibility of parole after thirty-five years. As previously stated, defendant was only fifteen years old at the time of the offense.

   La. R.S. 14:30.1 provides that the sentence shall be served without the benefit of parole, probation, or suspension of sentence. In February of 2016, when defendant was resentenced, La. R.S. 15:574.4 (E)(1)(a) provided that a person convicted of second-degree murder committed when he was under the age of eighteen may be eligible for parole after serving 35 years. Effective August 1, 2017, however, the Louisiana Legislature added retroactive provisions to La. R.S. 15:574.4 and La. C.Cr.P. art. 878.1, which allow juveniles convicted of murder to obtain parole in accordance with the conditions and requirements set forth therein. *See* 2017 La. Acts 2017, No. 277, § 1 & § 2; *State v. Brooks*, 51,917 (La. App. 2 Cir. 4/11/18), 247 So.3d 1071, 1073, *writ denied*, 18-705 (La. 1/14/19), 261 So.3d 785. La. R.S. 15:574.4, as amended, reduced the required time a juvenile must serve before becoming eligible for parole from 35 years to 25 years. *See State v. Terrick*, 18-102 (La. App. 5 Cir. 8/29/18), 254 So.3d 1246, 1251 n.7, *writ denied*, 18-532 (La. 1/14/19), 260 So.3d 1217. Effective August 1, 2019, La. R.S. 15:574.4 provides, in pertinent part:

G. (1) Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense and whose indictment for the offense was prior to August 1, 2017, shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1(B) and all of the following conditions have been met:

(a) The offender has served twenty-five years of the sentence imposed[.]

In *Terrick, supra*, the defendant was a juvenile at the time of the 2001 offense and was tried as an adult on a charge of second-degree murder. This Court affirmed the conviction and resulting sentence of life in prison without the benefit of parole, probation, or suspension of sentence. But in 2012, the United States Supreme Court held that the Eighth Amendment prohibition of cruel and unusual punishment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2466, 183 L.Ed.2d 407 (2012). Terrick filed a motion to correct illegal sentence requesting resentencing under *Miller*. The trial court resentenced defendant to "life with the benefit of parole after serving twenty-five years" pursuant to La. R.S. 15:574.4(G). On appeal, this Court affirmed Terrick's re-sentencing.

In *Brooks, supra*, the defendant committed two counts of second-degree murder at the age of seventeen, was convicted on both counts, and in 2006, was given two concurrent life sentences without the possibility of parole. His convictions and sentences were affirmed. On May 31, 2017, the trial court amended Brooks' sentences to life imprisonment with the possibility of parole pursuant to *Miller* and La. R.S. 15:574.4(E), which at the time of Brooks'

resentencing required thirty-five years to be served before consideration for parole. This Court held that La. R.S. 15:574.4(G) (2017) "now governs retroactively" and specified that a defendant who committed second-degree murder before turning eighteen becomes eligible for parole consideration, if at all, after serving 25 years of the sentence.

Pursuant to La. C.Cr.P. art. 882, an appellate court may correct an illegal sentence at any time. When a sentencing error involves the imposition of restrictions beyond those authorized by the legislature, the Louisiana Supreme Court instructs appellate courts to correct the error pursuant to the authority granted in La. C.Cr.P. art. 882. *State v. Sanders*, 04-17 (La. 5/14/04), 876 So.2d 42.

Defendant was fifteen when he committed second-degree murder and was indicted before August 1, 2017. In light of *Miller*, *Terrick*, *Brooks*, and the current provisions of La. R.S. 15:574.4 (G), we hereby amend defendant's sentence to render defendant eligible for parole after 25 years if all conditions are met pursuant to La. R.S. 15:574.4(G). *See also State v. Allen*, 19-377 (La. App. 5 Cir. 4/30/20), 2020 WL 2079030 (amending defendant's sentence to eliminate the parole restriction on count one for the first ten years of defendant's eighteen-year sentence, pursuant to Article 882). We further remand to the trial court with instructions to amend the sentencing minute entry and the Louisiana Uniform Commitment Order (UCO) to correctly reflect the sentence as amended. *Id*. The Clerk of Court for the 24th Judicial District Court is directed to transmit the UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections legal department. *See State v. Long*, 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142.

With respect to the trial court's failure to state that the sentence should be served without the benefit of probation or suspension of sentence, La. R.S.

15:301.1(A) provides that these statutory restrictions, even if not recited at sentencing, are deemed to be contained in the sentence and are therefore statutorily effective. *State v. Williams*, 00-1725 (La. 11/28/01), 800 So.2d 790, 799. Thus, the omission at sentencing does not require corrective action. *See State v. Young*, 13-745 (La. App. 5 Cir. 4/9/14), 140 So.3d 136 n.2, *writ denied*, 14-1002 (La. 12/8/14), 153 So.3d 439.

(iii)    Post-Conviction Relief Advisory

The transcript indicates the trial court advised defendant that he had "two years after the sentence and judgment becomes final to file for post-conviction relief." The commitment indicates that the trial court advised defendant that "he/she has thirty (30) days from today's date to appeal this conviction, and two (2) years after judgement of conviction and sentence has become final to seek post-conviction relief." The transcript prevails. *See Lynch, supra*. If a trial court fails to advise or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, this Court may correct this error by informing defendant of the applicable prescriptive period for post-conviction relief in its opinion. Accordingly, we advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after his conviction and sentence have become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See State v. Oliver*, 14-428 (La. App. 5 Cir. 11/25/14), 165 So.3d 970, 978, *writ denied*, 14-2693 (La. 10/9/15), 178 So.3d 1001.[13]

**DECREE**

Defendant's second-degree murder conviction is affirmed. Defendant's sentence is amended follows: Tory Clark is sentenced to life imprisonment at hard

---

[13] We nonetheless acknowledge that the Louisiana Supreme Court granted defendant an out-of-time appeal after his first appeal was ruled procedurally defective, the case was remanded, and counsel for defendant did not file a second motion for appeal after the procedural defects were cured, as this error occurred due to no fault of defendant.

labor in the Louisiana Department of Corrections, without the possibility of probation or suspension of sentence. Defendant may become eligible for parole after serving 25 years. The case is remanded to the trial court where the Clerk of Court is directed to amend Mr. Clark's sentencing minute entry and the Louisiana Uniform Commitment Order (UCO) to reflect the amended sentence and to transmit the amended UCO to the appropriate authorities.

**CONVICTION AFFIRMED;**
**SENTENCE AMENDED;**
**CASE REMANDED FOR**
**CORRECTION OF THE UCO**

STATE OF LOUISIANA                    NO. 20-KA-167

VERSUS                                FIFTH CIRCUIT

TORY N. CLARK                         COURT OF APPEAL

                                      STATE OF LOUISIANA

**JOHNSON, J., DISSENTS, IN PART, WITH REASONS**

I, respectfully, dissent in part from the majority opinion on the issue of whether the trial court erred in requiring Defendant, Tory N. Clark, to stand before the jury with the offending weapon and pull the trigger four times. The majority finds that the trial court did not abuse its discretion in permitting the demonstration and reasons that the sequence of events surrounding the shooting was important and relevant to determine Defendant's credibility. I disagree.

Relevant evidence is defined by La. C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402.

Here, the State argues that the prosecutor's intention in having Defendant demonstrate how he shot the gun at trial was to help the jury determine the truth of Defendant's assertion of self-defense. However, a demonstration of how Defendant shot the gun had no relevance on whether he acted in self-defense; thus, the demonstration itself could not have had any bearing on Defendant's credibility and could not have been used to impeach or discredit him. Additionally, the jury could have ascertained the differences between Defendant's live testimony and his statement to Detective McRae on whether he pulled the trigger of the gun four times or the gun jammed without a live

demonstration of how Defendant shot the gun.  The demonstration in this matter was purely prejudicial and irrelevant.

While I find the trial court's allowance of the demonstration to be an error, I find it to be a harmless error.  There was relevant evidence presented that was sufficient to support Defendant's conviction, and, in this instance, the prejudicial effect does not necessitate a new trial.  However, I write to emphasize the danger in upholding a ruling like the one made by the trial court on this issue.  That ruling could open the floodgates of widespread use of irrelevant demonstrations that substantially prejudice defendants in front of juries, particularly in cases where the evidence is weak.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 18, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**20-KA-167**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. RAYMOND S. STEIB, JR. (DISTRICT JUDGE)
GAIL D. SCHLOSSER (APPELLEE)          MATTHEW R. CLAUSS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

### MAILED
BRUCE G. WHITTAKER (APPELLANT)
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
1215 PRYTANIA STREET
SUITE 332
NEW ORLEANS, LA 70130

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
SHANNON K. SWAIM (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053